## MERSHON et al. v. O'NEILL.
### No. 5405.

District Court, E. D. New York.
July 22, 1932.

Supplemental Opinion Oct. 6, 1932.

Cooper, Kerr & Dunham, of New York City (Sturges S. Dunham and C. Blake Townsend, both of New York City, of counsel), for plaintiffs.

Frank C. Cole, of New York City (Vernon M. Dorsey and Frank C. Cole, both of New York City, of counsel), for defendant.

BYERS, District Judge.

The plaintiffs sue in equity for alleged infringement of United States Letters Patent No. 1,141,402, issued June 1, 1915 (application filed June 19, 1913), and No. 1,-784,674, issued December 9, 1930 (application filed July 14, 1923). For convenience, these will be referred to hereinafter as the first and second patents.

Both were issued to the plaintiff Mershon, who, in turn, licensed the corporate plaintiff's predecessor to make, use and sell the inventions covered by the said patents.

The device involved is known as an electrolytic condenser, and, in the form presently involved, is used in the so-called power pack of a radio receiving set in domestic use.

The office of the device is to remove the so-called hum incident to the employment of alternating current, which hum is loud enough to be incompatible with the kinds of noise which it is the purpose of the radio to reproduce.

The purpose is accomplished by passing the current into the condenser in the condition in which it emerges from the rectifier. The alternating current as it is received into the power pack is characterized by the two phases peculiar to such a current, which are due to its origin; in the rectifier, the polarity of the current is rendered unidirectional, but it is still a pulsating current, and these pulsations cause the hum.

The electrolytic condenser receives the rectified current, and so delivers it that the pulsations are flattened out, and the current may be visualized as almost a straight line of unidirectional constituency.

The device has been successful in the practical and commercial sense; otherwise this litigation would not have arisen.

The Electro Formation, Inc., is the successor to Amrad Corporation to which the Mershon licenses were granted; the latter company was financially embarrassed, and during the year 1926 it was manufacturing an electrolytic condenser on a very small scale, and its property and assets were taken over by the interests which now control the Electro Formation, Inc., during the winter of 1926–27. The precise steps by which this result has been accomplished are of no importance, but the fact is that, beginning in 1927, such a condenser was manufactured and sold by the Amrad Corporation in substantial volume; that is to say: 77,000 in the year 1927; 422,000 in the year 1928; 741,000 in 1929; 651,000 in 1930, and over 1,700,000 in 1931.

During the second half of 1929, the defendant corporation, through its representative and present President, Mr. Robert C.

Sprague, interviewed the then active head of the Amrad Corporation, Mr. Hahn, on two or three occasions, with respect to a possible license to the defendant company, to enable it to manufacture the plaintiffs' condenser.

During the latter part of the same period of time, a member of the laboratory staff of the then Amrad Corporation, Mr. Appleton, and Mr. Sprague had a conversation, following which Mr. Appleton entered the employ of the defendant.

Mr. Petrie, one of the Amrad salesmen, was hired by the defendant company during 1930.

Mr. Clark, described as a "sales engineer," left the Amrad Corporation around the 1st of October, 1929, and was employed by the defendant company.

Mr. Gasset, who is said to have related that he had been temporarily laid off by the Amrad Corporation, was hired by the defendant; the precise time is not stated, but he is said to have had charge of the mechanical assembly of the different parts of the defendant's device since entering its employ.

Mr. Conrad was in the employ of the Amrad Corporation, as foreman in electrolytic condenser production, and left because of failing health in the fall of 1928; about one year later, he entered the employ of the defendant company, and remained for eighteen months or so. His duty consisted in setting up equipment and general work on making samples of electrolytic condensers.

As to the first four of the above named, the evidence is in conflict as to whether the hiring was the cause of the breaking off of the negotiations for a license or not. Mr. Hahn, testifying for the plaintiff, said that it was; Mr. Sprague, testifying for the defendant, said that negotiations came to nothing because of delay on the part of Mr. Hahn in reaching a definite conclusion. It is clear, at least, that prior connection with the plaintiff was not regarded as a disqualification for later employment of these several persons by the defendant.

Samples of the defendant's product were circulated among the trade in January, 1930, and production began at their plant in North Adams, Mass., on or about April 1, 1930, and since that time the competition between the two companies has been active and sustained.

The similarity of the devices is so marked that little or no argument was made on the subject of infringement.

The defendant relies on two major propositions: (a) that neither the plaintiffs' nor the defendant's device is an embodiment of either patent, and (b) that the patents in suit are invalid for lack of invention.

The outward appearance of the two devices is strikingly similar. Plaintiffs' exhibits 6, 7, 8 and 9 are the defendant's product, and are copper cylinders, about 4⅜ inches in height, having a diameter of about 1⅜ inches, the bottom being enclosed in a brass cap having apertures at its base, and the top presenting the appearance of a black disk with a projecting member about 5/16 of an inch in height, for connection to an electrical circuit.

Plaintiffs' Exhibit 12 and defendant's Exhibit A are the plaintiffs' device, namely, a copper cylinder about 5 1/16 inches in height, having a diameter of 1⅜ inches; the bottom consists of a copper cap having apertures at its base. The construction at the top presents a slightly different appearance from that of the defendant's product, in that the connecting member projects about ⅞ of an inch. The plaintiffs' device is labeled, and the defendant's in evidence is not.

It will be convenient to examine the first contention, because manifestly, if the plaintiffs' device does not embody the patents in suit, there can be no basis for relief.

The first patent, No. 1,141,402, has to do with certain improvements in electrolytic apparatus employing filmed electrodes. Claim 5, upon which the plaintiffs rely, reads as follows: "5. An electrolytic condenser comprising a containing vessel; aluminum electrodes therein, coated with heat-resistant electrolytic films; and an original electrolyte in the vessel, containing borax and a free acid."

The patent was issued June 1, 1915, and a disclaimer was filed November 19, 1929, by the patentee, the licensee, the Amrad Corporation, acquiescing, thus: the patentee "therefore disclaims from the scope of said Letters Patent any acidulated electrolyte which is not acidulated with an inorganic acid such as boric or phosphoric acid."

The evidence demonstrates that, at the time of the issuance of this patent, an electrolytic condenser for use in the power pack of the receiving set of a radio was not in demand; nor was such demand anticipated.

The requirement which the condenser was designed to meet had to do solely with other employment of alternating current.

The application of the condenser princi-

ple to the radio receiving set was the direct result of the attachment thereof to the ordinary household source of alternating current. That the Mershon condenser might have a future in connection with radio was appreciated as early as 1922, when Professor Pupin first employed the Mershon electrolytic condenser which is plaintiffs' Exhibit 29, having a capacity of about 40 microfarads.

That condenser appears to be an aluminum can, 4 inches high and 3 inches in diameter, and having a black rubber cap constituting the top, upon which appears the following: "Mershon Electrolytic Condenser Manufactured under patents of Ralph D. Mershon—Dec. 26, 1911, June 24, 1913, June 1, 1915, June 18, 1918, Dec. 23, 1919. Other patents pending."

Thus it was asserted by the predecessor of the corporate plaintiff as early as 1922 that the electrolytic condenser which it then made and sold embodied the invention disclosed in the first patent now involved.

The latter opens with the statement that the action of electrolytic condensers, rectifiers, and similar devices depends upon the film which may be formed upon the surface of the aluminum, tantalum, magnesium and other metals when immersed in certain electrolytes and subjected to the electric current. Continuing, it is related that, in order that the film produced in the ordinary manner shall evidence to an efficient degree its necessary qualities of high specific resistance and high dielectric strength the temperature at which the film-coated electrode is used must not be much, if any, above a certain value—about 40° C. As the temperature approaches that point, the film begins to lose the necessary qualities.

Reference to prior patents is made, in which the inventor recites that he has described several effective methods of forming films which possess temperature-resistant properties, and he says: "and in the application mentioned I have described and claimed broadly the article having such a film. Reference may be made to said patent and application for a full and detailed description of the preferred modes of procedure in producing the film." In such production, it is essential that, during or after its formation, the film is subjected to a higher temperature than in actual use.

The recital continues to the effect that the electrode must be chemically clean, and then immersed in a solution, "preferably saturated, of borax or other suitable film-pro-

ducing agent, and is connected to one terminal of a source of current, either alternating or direct, at a suitable voltage as will be explained hereinafter. The other terminal of the source is connected to the electrolyte as by means of a suitable cathode immersed therein or by connecting the terminal to the vessel containing the electrolyte if such vessel is of conducting material."

The process of forming the film is then described, and this involves the application of the electric current; at the conclusion of which the recital continues: "On examining the article it will be found coated with a closely adherent film, harder than the metal on which it is formed and less subject to scratching and abrasion, resistant to acids, and in color varying from bronze to greenish bronze or brownish bronze."

The inventor prefers to start the formation of the film with the film-producing agent at boiling temperature, but this is not essential; it may be cold at the start, and have its temperature raised as the formation of the film goes on; it is desirable, however, that the solution be boiling when the forming current is turned off, to prevent the adhesion of bubbles to the surface of the article. The necessity for having the bath boiling briskly for some time before the current is turned off is explained.

The part which voltage plays in the production of the film is described, and the recital continues: "If instead of using a simple solution of a film-forming salt as above described, the bath be acidulated with one or another of the acids whose salts may be used as film-producing agents, as for example borax, or phosphoric acid, etc., the process of forming the heat-treated film is considerably expedited. The amount of acid used may be varied according to circumstances but I have obtained good results with a bath made up in the proportion of two gallons of the saturated borax solution, three pounds of boric acid, and an additional half pound of borax."

"The film produced as above described is believed to be composed in part of the metal on which it is formed in chemical combination with one or more of the elements composing the bath. Thus in the case of aluminum treated in a borax solution the film is composed in part of aluminum. I am not certain what the other constituent or constituents are, but careful analysis indicates that the film is a form of, or is composed largely of, aluminum hydrate."

The inventor says that he has discovered

that, while electrodes having the heat-resistant films described can be advantageously used in any electrolyte, in an electrolytic condenser, rectifier or other apparatus, "they do not evidence to the fullest extent their remarkable property of withstanding high temperatures unless they are used (1) in the identical solution, originally acidulated or unacidulated, in which the films were formed or subjected to the heat-treatment; or, (2) in some other, but acidulated, electrolyte. That is, if the films are not used in the identical electrolyte of their formation or heat-treatment, then whatever electrolyte they are used in must be acidulated. It is this discovery that forms the subject of the present application for Letters Patent. In the appended claims I have used the term 'an original electrolyte' to mean the first electrolyte or its equivalent, an acidulated electrolyte."

The best results have been obtained by the inventor—that is, the best results obtainable with a fresh electrolyte—with an electrolyte of the following proportions: Distilled water, one gallon; boric acid, one and a half pounds; borax, one quarter pound.

The drawing is described as showing a cross section of a simple electrolytic condenser, namely, a vessel containing the electrolyte and six electrodes; three connected to one terminal, and three connected to the other terminal. The heat-resistant films, greatly exaggerated in thickness, are shown, as is the electrolyte, namely, the identical electrolyte in which the films were formed or subjected to the necessary heat-treatment; or some other electrolyte, which is acidulated.

The office of the film is to furnish the dielectric; i. e., the non-conductor, between the two conducting elements of the condenser; namely, the aluminum electrode and the electrolyte.

A condenser as originally conceived is described by the plaintiffs' expert, Mr. Waterman, as consisting of two conducting bodies separated by an insulating material, referred to as a dielectric. He states that a typical condenser may be thought of as a sheet of glass, paper, mica, or other suitable insulator, having on each side of it a metal plate such as a tinfoil sheet; these were called the armatures, and are connected to the opposite poles of a source of current; when this is done, a stress is set up in the non-conductor, and, if the charging potentials be then removed, it will be found on connecting the two armatures that a discharge will take place, showing that electricity has, so to speak, been stored. The energy which was imparted to the non-conductor has been returned to the electric circuit by connecting the two plates together.

The electrolytic condenser consists, therefore, of the aluminum electrode as one armature, and the electrolyte as the other, while the film constitutes the dielectric or non-conducting element.

The plaintiffs' device in suit contains a filmed aluminum anode immersed in an electrolyte; the whole contained in a copper can, which is said to constitute the cathode, i. e., that into which the current passes from the electrolyte.

The aluminum element is 2 inches in height having a diameter of about 1 inch, composed of a strip rolled around and attached to an aluminum rod, and presents a cylindrical appearance; the total area of the aluminum anode is about 80 square inches.

The defendant's anode is a very thin aluminum sheet which has been so disposed that it has also assumed a cylindrical form, made up of a number of coils, and, while the cylinder itself is only about 2¼ inches in height by about 1⅛ inches in diameter, the succession of circular coils, if they may be so described, result in presenting an area of over 64 square inches, compressed into a compass of the dimensions stated. Such an anode is plaintiffs' Exhibit 14.

The electrolyte contained in each device is acidulated, and is composed of borax, boric acid and water, although the formulas differ.

Chemical analysis shows the following comparison between the contents of the plaintiffs' electrolyte and that of the defendant:

A liter of the former contains 16.09 grams of borax and 80.45 grams of boric acid, and the balance water; a liter of the defendant's electrolyte contains 6.3 grams of borax, 69.7 grams of boric acid, and the balance water.

Returning now to the first patent, the testimony stands uncontradicted that it teaches an aluminum electrode which is coated with a heat-resistant film which is formed so as to withstand a temperature higher than that at which it will be used.

The device is not perfect; that is to say, a portion of the current penetrates the film, and this is called the leakage current. The high heat-resistant property is requisite because this leakage current produces additional heat in the condenser; it is necessary

therefore to the success of the condenser, that the amount of leakage current be held to an absolute minimum; to the extent that the film is punctured by the leakage current, a self-healing process in the film is set up and operates. These properties have been secured, according to the testimony, by reason of the fact that the film is formed at a high temperature. It is stated that no one is able to give the reason for this fact, the result having been arrived at through the well known trial and error process. The evidence demonstrates that the plaintiffs' condenser contains a film so formed.

As has been said, the plaintiffs' condenser has been shown to consist of a copper container having in it an electrolyte comprised of borax, boric acid and water, which had been acidulated, and suspended in the electrolyte is an electrode, being a rolled sheet of filmed aluminum coiled around an aluminum post designed to be connected with the positive source of potential.

One question presented seems to be, whether the aluminum electrode so constituted is the same thing as the plurality of electrodes shown in the patent, namely, six condenser electrodes, three connected to one terminal, and three to the other.

The drawing shown in the patent was intended to illustrate the operation of the apparatus on a circuit containing only alternating current, and, when the device was so employed, three of the anodes accepted current of one polarity, and, in the next phase of the cycle, the second three accepted current of the same polarity as did the first three during the initial phase. This means that each set of three electrodes acted as anodes in succession during one cycle.

In a filter circuit of a modern radio receiving set, the current, when it reaches the condenser, is predominantly direct, although it retains the pulsations of alternating derivation; as it is a unidirectional current, the necessity for two sets of anodes no longer exists, and one set of anodes or one anode can perform the function that required the two sets when only alternating current entered the condenser. Therefore the substitution of one anode, or one set of anodes for two anodes or two sets of anodes, is not a departure in principle from the teaching of the patent.

In order that a condenser may function successfully, it must possess in high degree the characteristic of capacity, and that is governed, according to the testimony, by the area of the anode, because the area of the film is coextensive therewith.

As has been seen, the area of the plaintiffs' anode is in excess of 80 square inches, and of the defendant's over 60 square inches, although both are in compact form.

On the argument, the defendant's solicitor said on this subject: "I do not know that that question of difference is so controlling as to the first patent," and so it seems to this Court; that is to say, it is thought that the single anode of the plaintiffs' device in suit is within the teaching of the first patent, and the device therefore may be said to be an embodiment of the first patent.

As there is no perceptible difference between the plaintiffs' device and the defendant's, it follows that the latter also is an embodiment of the plaintiffs' first patent.

With regard to the second patent, the same argument is made, and it becomes necessary to consider that patent somewhat critically. It was filed in July, 1923, or over a year after Professor Pupin told Mr. Mershon that the latter's electrolytic condenser appeared to have great possibilities in the field of radio development.

The recitation is that the invention relates to electrolytic apparatus, such as condensers, rectifiers, lightning arresters, etc., in which aluminum electrodes or other filming metal are immersed in a suitable electrolyte, and that more particularly the invention relates to the formation of such films on the active electrodes, termed for convenience anodes, and to the subsequent operation of the condenser or other device, and is based on the discovery that the material of which the tank or container and the rack in which the anodes are supported, etc., are made, is an important factor in the formation of the films and the operation of the device. It is said that it had formerly been proposed to make such parts of filming metal, such as aluminum, and form films thereon, in order to prevent or diminish corrosion. For the best results the filmed inactive parts should be excited, as by connection with the positive pole of a source of unidirectional voltage of suitable value, as described in the inventor's patent No. 1,-507,395, issued September 2, 1924, disclosing a method said to be effective for the purpose but not always convenient.

The inventor says that he has conducted a series of experiments and tests to determine the effects of non-filming metals upon

the apparatus, especially upon the formation of the anode films and upon the power factor of the condenser. These experiments showed that certain metals are harmful, such as lead, zinc and iron, of which lead seems to be the worst, because it poisons the condenser. Other metals are referred to, such as nickel, tin and silver, and they are said to exert a deleterious influence only when present in the electrolyte, and, if removed, leave no harmful effects. Copper is said to have no effect either in the formation of the films or in the operation of the condenser.

The drawing which illustrates the invention shows an electrolytic condenser of the excited type, i. e., one in which unidirectional positive voltage is impressed on each filmed electrode "to oppose flow of current thereto from the electrolyte by conduction through the film when the alternating voltage on the condenser reverses. In this way conductive flow of current through the film can take place only toward the electrolyte, not from the electrolyte to the filmed metal, and corrosion of the filmed metal by repeated breakdown and reformation of the film is thus prevented. For this purpose the condenser requires a cathode, that is, a conducting member in contact with the electrolyte and connecting the same to the negative side of the circuit which supplies the unidirectional voltage."

The illustration of the drawing presented a container having a cover and containing an electrolyte in which are immersed 6 anodes (2 sets of 3), one set connected to each pole of an alternating current circuit. A source of unidirectional voltage for exciting the condenser, being a direct current generator, is shown, having its positive pole connected to the neutral point of a balance coil, the terminals of which are connected to the condenser terminals which are connected with the alternating current circuit. The negative pole of the direct current generator is connected to the electrolyte "preferably by connection with the tank which contains the electrolyte." The description of the drawing continues thus: "Since the film on an aluminum anode is not perfectly non-conducting, there is more or less leakage of current therethrough to the electrolyte when alternating voltage is impressed on the condenser. This current is of course pulsating. In an excited condenser there is also more or less leakage due to the exciting voltage, and both this current and that due to the alternating voltage pass through the electrolyte by conduction to the cathode."

One feature of the present invention is said to be that the tank and the cover, and the rack from which the anodes are suspended, are made of copper. The manner in which other metals may be employed is described somewhat at length, but add nothing to the present discussion.

An illustration is given of one method of film formation, at the conclusion of which the following occurs: "In any case the films are preferably formed at a temperature above that at which the apparatus will subsequently be used, as described in my prior Patent No. 1,012,889, issued December 26, 1911. I also prefer to form the films in the electrolyte in which the anodes will subsequently be used, as explained in my prior Patent No. 1,141,402, issued June 1, 1915." (The first patent in suit.)

The claims upon which plaintiffs here rely are the following:

"5. An electrolytic condenser having an electrolyte, an anode of filming metal immersed therein, a source of unidirectional current having its positive pole connected with said anode, and a copper cathode in contact with the electrolyte and connected with the negative pole of the said source of current."

"8. In an electrolytic condenser, a copper containing vessel or tank, an electrolyte therein, an anode of filming metal immersed in the electrolyte, and a source of unidirectional current having its positive pole connected with said anode and its negative pole connected with the copper tank."

"10. An electrolytic condenser comprising a copper tank, an electrolyte therein, and an anode of filming metal immersed in the electrolyte."

"12. An electrolytic condenser having an electrolyte and susceptible of being harmfully affected by the presence of lead in the electrolyte, an anode of filming metal in the electrolyte, and a condenser member of copper in contact with the electrolyte."

"13. The combination of a circuit having alternating and unidirectional components of voltage and current, and an electrolytic condenser having electrodes connected with said circuit, at least one of the electrodes being of copper and constituting a cathode, connected with the negative side of said circuit, and at least one of said electrodes being of filmed metal and connected with the positive side of said circuit."

"14. The combination of a circuit having alternating and unidirectional components of voltage and current, and an electrolytic condenser having an electrolyte and having elec-

trodes connected with said circuit, at least one of said electrodes being a vessel of copper, containing the electrolyte and serving as a cathode, connected with the negative side of said circuit, and at least one of said electrodes being of filmed metal and connected with the positive side of said circuit."

"15. An electrolytic condenser having an electrolyte, a filmed anode, a copper member surrounding the anode, and an exciting circuit having its positive side connected with the anode and its negative side connected with the copper member."

"16. The combination of a circuit having alternating and unidirectional components of voltage and current, and an electrolytic condenser having an electrolyte and a filmed anode therein connected with the positive side of said circuit, and a copper member surrounding the anode and connected with the negative side of said circuit."

The invention disclosed in the second patent, according to the testimony, is the discovery that the tendency of the condenser or electrolytic cell to fail to perform its function can be overcome by making the cathode element of copper; apparently the exciting circuit, i. e., that which produces the direct current, is necessary in order that there shall be no reversal of polarity; but no such source of direct current is required in the filter circuit of a radio receiving set, because the current as it leaves the rectifier is unidirectional, the element of reversed polarity having been removed as heretofore stated.

The defendant's major argument, of which there are many versions, stated in simple language, is that the second patent as filed did not cover what the defendant calls a unilateral condenser having one filmed anode, the electrolyte in which the anode is immersed, and a copper tank or can acting as both the container of the other elements and the cathode of the condenser.

In order to demonstrate this, the defendant calls attention to the fact that the drawing discloses two sets of anodes, composed of three elements each, a source of unidirectional current having its positive pole connected with the anodes, and in contact with the electrolyte and connected with the negative pole of the source of unidirectional current.

This is true and the argument which constitutes the defendant's contention was anticipated in the Patent Office, as appears from a reading of the file wrapper of the patent in question, for, under date of June 18, 1929, four of the claims were rejected as being "broader than the disclosure will allow in

limiting the condenser to a single anode. The disclosure is limited to two anodes and it is not obvious that a single anode condenser may be substituted therefor."

The reply to that rejection, bearing date of December 11, 1929 (*which is over a month before the defendant's device was circulated in sample form*) presents the contention that, because one anode structures were known to the art, a claim which covers a species (i. e., electrolytic condensers) is generic and therefore is not limited to a plurality of anodes but equally covers a single one.

This argument proved to be acceptable to the examiner, and what is now sought is in effect a review of that decision.

The plaintiffs' drawing shows an electrolytic condenser which functions in part as the result of the presence of unidirectional current supplied by the generator; but a direct current alone does not requisition the offices of a condenser, therefore the latter is called into play because the current which passes through the condenser is partly direct and partly alternating.

The function of the condenser is to subdue the pulsating element; i. e., remove the alternating ripples from what has become predominantly a unidirectional current. In order to accomplish this purpose, the movement of the current must be constant in the direction from the filmed anode to the electrolyte, and the cathode element conducts the current from the condenser, and it seems not to be important that the unidirectional impulse must be received from a direct current generator which, according to the drawing, is present in order that the purpose of the condenser may not be frustrated by a reversal of polarity which otherwise would take place.

If this is so, then the source of the direct current is not vital to the teaching of the patent, and the unidirectional current may come as well from a rectifier as from the two sources represented by the direct current generator and the source of alternating current; hence it is the presence of the unidirectional current and not its origin which determines the ability of the condenser to function.

In other words, if the current initially received by the condenser is unidirectional, one anode suffices to render the condenser operative, and consequently is expressed in the teaching of the patent.

The foregoing is stated with diffidence, but is based upon a study of the testimony and the briefs, and is therefore deliberate.

It will be seen from what has been said that claims 10 and 12 read on the defendant's

device as on the plaintiffs', and, unless the second patent should not have been granted, the defendant has invaded the domain of the plaintiffs' second patent.

### Prior Art.

As against the first patent, the defendant cites:

*Pollak, No. 672,913 (1901)*—In terms this applies to electrolytic current rectifiers and condensers, and there are two claims, the first for an electrolytic transforming or condensing cell having an electrolyte containing a free organic acid, and the second for an electrolyte transforming or condensing cell having an electrolyte containing a free organic acid of the aromatic class. The defendant's expert interpreted the expression "transforming cell" to mean a rectifier according to current parlance.

The disclosure does not teach a condenser having a filmed anode. It does teach a condenser having two aluminum electrodes.

*Buttner, U. S. No. 809,770 (1906); German No. 153,515 (1903)*—The patent in terms refers to an asymmetric cell. The claim is: "In an asymmetric cell, the combination with an aluminum anode and a cathode of any metal, of an electrolyte consisting of a solution of caustic ammonia and boric acid."

There is no reference herein to a condenser; nor to a film formed on an anode, and the inventor specified that the object of his patent is to provide a new and improved electric battery using aluminum electrodes and an electrolyte not likely to corrode the electrode, and it is said that the electrolyte is capable of raising the resistance of the aluminum when the latter is used as an anode, and is effective at high temperatures. The invention is confined to the electrolyte.

This patent was cited by the Patent Office against the first patent, and it was pointed out that the film was not heat-resistant in the Buttner patent; whereupon the application was passed.

The German patent in terms applies to an electrolytic rectifier, and the claim is for such a device in which the active electrode consists of aluminum and the passive electrode consists of iron or of another material which is practically unattackable by the electrolyte, characterized by the fact that the electrolyte is a combination of boric acid, ammonia and water.

There is no reference whatever to a heat-resistant film, which constitutes the dielectric in both the plaintiffs' and the defendant's device.

*Weinberg, No. 979,906 (1910)*—This patent applies to an electrolytic cell, and the claims are: (1) the method of constructing an electrode for an electrolytic cell, consisting in the preliminary immersion of an aluminum electrode in a special forming solution which is independent of the electrolyte in which the electrode is to be used, passing an alternating current through the same, until said electrode is formed, and (2) the method of constructing an electrode for an electrolytic cell, consisting in the preliminary immersion of an aluminum electrode in a phosphate solution which is independent of the electrolyte in which the electrode is to be used, etc., as in the first claim.

The defendant's expert testified that this is a process patent, and he summarizes his comments by saying that the patent teaches first that the prior art has used the original electrolyte in the device, and that it is better not to form the device in the final electrolyte.

The bearing of the foregoing on the first patent in suit does not appear from the testimony.

*Hayden, No. 996,583 (1911)*—This refers to an electrolyte for electrolytic cells, and the claims are restricted to the combination of electrodes and an electrolyte consisting essentially of a solution of ammonium octoborate alone and with an organic substance; and with glycerin; also an electrolyte consisting of a substantially neutral solution of ammonium octoborate.

The difference between the teachings of the Hayden patent and the first patent in suit are quite obvious.

*Peek, No. 1,008,860 (1911)*—The patent refers to an electrolyte for aluminum cells, and the claims refer to a solution of a borate and a tartrate; a mixture of salts one of which is a tartrate and another is a borate; a solution of borates and tartrates of ammonium; of borates, tartrates and glycerin; a neutral solution of borates, tartrates and glycerin; a solution of a borate and a tartrate of an alkali in a proportion of about six to one respectively.

In addition to the absence of a reference to any heat-resistant film, it is obvious that the electrolyte taught by this patent has no bearing upon the first patent in suit.

*Mershon, No. 1,012,889 (1911)*—This patent applies to "art of forming dielectric films." The claims are sixteen in number, and the patent is obviously for a process.

The disclosure of this patent is the subject of a certain difference of opinion between

the experts called for the defendant and the plaintiffs.

The defendant's expert says that there is a distinct difference in disclosure between this patent and the first in suit, because the latter, instead of specifying the use of a higher temperature for the formation of the film than for its use, recommends the boiling of the electrolyte during the formation. (It may be noted that the defendant's film is not formed, according to its testimony, within two or three degrees of boiling, which may not be unrelated to the defendant's expert's emphasis of this feature of the Mershon process patent.)

There is no disclosure in this patent, according to the testimony, of an aluminum electrode having a heat-resistant film and operated in an original electrolyte containing borax and a free acid.

*Mershon, No. 423,598 (French Patent, 1911)*—Both the plaintiffs' and the defendant's experts conceded that the teaching of this patent is the same as the one last above considered, namely, the process for creating a heat-resistant film.

The defendant's argument is that there was disclosed in the French patent a heat-resistant film in a solution of borax acidulated with boric acid, and hence that the French patent, which antedated the first patent in suit by two years, was a competent citation concerning the prior art as against the latter, because of the necessary disclosure of the result of the process as well as of the process itself.

Assuming but not deciding that this is a sound argument, the answer seems to be that the thing disclosed was a film, and a characteristic electrolyte used in its formation, not a condenser.

It seems to be important to recall that the first patent under examination is for an electrolytic condenser comprising certain constituents, and that the expired United States patent above referred to and the French patent have to do only with the process whereby a heat-resistant film is contrived.

*Zimmerman, No. 1,074,231 (1913)*—This patent refers to an electrolytic condenser, and the claims are eight in number and cover an aluminum electrode, a cooperating electrode, and an electrolyte consisting of solution of an oxyacid of boron, borax, glycerin and water; an electrolyte containing a borate and a soluble carbohydrate; an electrolyte consisting of a solution of an oxyacid of boron, a borate, glycerin and water; an electrolyte containing a substance for preventing oxids and ing a substance for preventing oxids and

precipitates forming and collecting in the cell; the same electrolyte in a rectifier; an electrolyte containing glycerin; an electrolyte containing glycerin and a compound of boron; an electrolyte containing a borate and glycerin.

This is called an anticipation of the first patent in suit, although it does not teach anything about an aluminum electrode coated with a heat-resistant film, and it does teach an electrolyte containing glycerin.

The testimony in this case is that the electrolyte employed by both parties would be adversely affected by the addition of glycerin.

The Zimmerman patent, therefore, neither anticipated the first patent in suit, nor did its teachings inevitably lead to the discovery embodied therein.

This patent also was cited by the Patent Office against the first patent in suit, and, upon the absence being pointed out of any reference to a heat-resistant film, the patent was granted.

*Gunther-Schulze (1906)*—This is a scientific article published in a German magazine devoted to the science of physics, entitled, according to the translation, "The Behaviour of Aluminum Anodes." Apparently the major thesis has to do with the theory that there is a layer of gas constituting a part of the dielectric of which the film is the other part. In the development of this thesis, a highly technical discussion is presented, which is undoubtedly a valuable contribution to the scientific literature pertaining to this general subject. In discussing the article, the defendant's expert, Graner, testified that the writer did not build electrolytic condensers or electrolytic rectifiers, but was interested in finding out the different influences involved, and in the elimination of those which were unimportant; among the important factors were temperature, voltage, and the various chemical constituents of the electrolytes.

Necessarily the article contains a discussion of the characteristics of the electrolytic film, and the temperatures at which it manifests the properties which are peculiar to it. It is not contended by the defendant that this article contained instructions which, if followed, would have resulted in the production of the device covered by the first patent in suit. The specific electrolyte disclosed therein is not shown, nor is a connection developed between the electrolytic film and the electrolytic condenser.

It is thought that this article is interesting, but not conclusive, and was calculated to

develop the spirit of inquiry rather than to announce a discovery which robs the first patent in suit of its originality.

The foregoing comprise the prior art teachings relied upon by the defendant to indicate that there was no patentable feature disclosed by the first Mershon patent.

Perhaps, if the defendant had chosen to select from this prior art the teachings not found in the plaintiffs' patent, its argument would be more persuasive. The only selection so made seems to be the electrolyte shown in the German Buttner patent.

Concerning the second patent, the following are urged:

*Pollak, No. 672,913 (1901)*—This patent has already been considered in connection with the first patent in suit. Its present interest lies in the teaching of a unilateral cell; that is to say, a device with a single filmed electrode and an indifferent electrode to rectify alternating current. This presents one of the mooted points in the case, namely, the difference between a rectifier and a condenser. It may be conceded that, if Pollak had taught a condenser with a single filmed anode and an electrolyte such as that found in the second patent in suit, and a copper cathode, there would have been complete disclosure of the device described in claims 10 and 12 of the second Mershon patent.

This point was first stated by the Patent Office under date of June 18, 1929, in the following language:

"Claim 5 (which was framed in the following language: 'Electrolytic apparatus of the class described, having an electrolyte, anodes immersed therein, a source of unidirectional current having its positive pole connected with said anodes, and a copper cathode in contact with the electrolyte and connected with the negative pole of the said source of current') is additionally rejected on the disclosure of the Pollak patent in view of the British patent or the patent to Mershon, both cited above. The Pollak patent shows an asymmetric cell having its copper anode connected to a source of supply. The British patent discloses a condenser having a filming electrode, a non-filming electrode, the device being connected to a source of D. C. The art is well enough advanced that the device shown in Figure 1 of Pollak, 672,913, will function as a condenser or a rectifier depending purely upon the direction of applied voltage as brought on in both Mershon and the British patent."

The applicant's attorney presented an interesting argument in response to the foregoing, and the Commissioner wrote, under date of January 10, 1930, in part as follows:

"Claims 25 and 36 are rejected on the disclosure of Pollak 672,913 in view of Bottome on the ground that there would be no invention in forming the copper electrode of Pollak as the container after the manner taught by Bottome. As stated previously and as brought out in British patent 1,069, the use of such a device as shown in Fig. 1 of Pollak 672,913 either as a rectifier or condenser is a matter of choice."

Thereafter such representations were made by way of pointing out the difference between a rectifier and a condenser that the claims in the patent now under examination were allowed, although others were rejected.

Therefore the precise contention now advanced was passed upon by the Patent Office with great care and deliberation.

It may be profitable to interrupt the discussion long enough to observe that however difficult it may be to follow the technical dissertation which has for its object the distinction between a rectifier, which necessarily deals with alternating current, per se, and a condenser, which necessarily deals with unidirectional current, the fact remains that in practical use each device serves its own purpose within well recognized limits, and that, when the defendant's device, for instance, was intended to be used as a rectifier, it promptly proved entirely inadequate for the purpose.

In a rectifier, because of the constantly reversing polarity of the current, the film is attacked, first in one direction and then in the other, and consequently the qualities which are needed to survive this treatment are not the qualities of capacity which are called for in the proper functioning of a condenser, the office of which may be likened to that of a reservoir.

The attempt has been made earlier in this discussion to point out that the very nature of the alternating current calls for the services of a source of direct current to be merged with the former when the processes of the condenser are called into play, and it is unnecessary to repeat that in this place, but recourse may be had to the testimony of the witness Waterman, who says:

"A rectifier rectifies within the limits of voltage permissible because the film refuses to conduct the alternating current impulse when it tends to send a current from the aluminum into the electrolyte, but breaks down as I have already explained, and permits

free flow of current from the electrolyte into the aluminum.

"I might put it this way. That an electrolytic condenser, in the broadest sense, is an asymmetric cell which does not make use of the asymmetric properties, while a rectifier is an asymmetric cell desiring to take advantage of the asymmetric properties and which uses those properties only."

This distinction is thought to explain the action of the Patent Office in granting the application set forth in the second Mershon patent as against the Pollak patent No. 672,-913. It will be recalled that the condenser illustrated by Pollak had two aluminum anodes.

In other words, there is no disclosure of a condenser having a filmed anode and a copper cathode.

*Pollak, No. 18,956 (British Patent, 1898)* —This also was cited by the Patent Office, and concerning it the defendant's expert, Graner, says that it is very similar to the United States patent. The disclosure of the latter, according to the testimony of the plaintiffs' expert, so far as it refers to copper, applies solely to the device as a rectifier, and has no reference to a condenser.

An article published by Pollak in 1901 was referred to in the testimony, over objection by the defendant, in the belief that his observations on this subject would perhaps throw light upon the teachings of his patents, and the comments are enlightening in so far as they indicate the patentee's recognition of the limitations which apply to his inventions.

*Ikle, No. 284,673 (1915)*—This patent is entitled "Electrolytic Rectifier." The claim is for such an article characterized by an electrolyte of basic carbonate of cupric ammonia which is produced within the cell on account of the fact that an auxiliary electrode composed of copper connected with the usual carbon electrode is dissolved in the electrolytic liquid which is composed of ammonia bicarbonate at the beginning of the forming process.

Let coke constitute the unfilmed electrode, and copper is destroyed in the process of operation. The device would not work as a condenser, and it is not so portrayed by the patentee.

These are the three patents which the defendant's expert, Graner, said were in equal proximity to the second patent in suit.

The defendant's brief, however, refers also to the following:

*Siemens & Halske, No. 194,620 (1906)*

*German Patent.*—This patent covers a circuit arrangement of electrolytic valve cells having valve action for producing approximately constant direct current from an alternating current source. The claim is as follows: "Circuit arrangement of electrolytic rectifying cells * * * having rectifying action for producing approximately constant direct current from an alternating current source, characterized by the fact that a cell (or group of cells) is connected in parallel with the load circuit, and a second cell (or group of cells) reversely and blockingly connected in series with the system formed by the first cell and the load circuit."

It must be clear from a reading of this patent that it teaches nothing concerning an electrolytic condenser.

The object which the patentee seems to have in mind is an improvement upon then existing devices to rectify alternating current.

This patent is not referred to by the defendant's expert as constituting prior art against the second patent in suit.

There are many infirmities alleged against the plaintiffs' patents by the defendant, which require comment:

It is asserted that the first patent should not have been granted, because an essential element is the heat-resistant electrolytic film, and that this discloses a property desirable in itself; that is to say, the term "heat-resistant" denotes the function of the film and, if permitted to stand, tends to create a monopoly beyond the invention. It is thought that it was the film created in accordance with the teachings of the patent which was claimed as an element thereof, and that the descriptive words "heat resistant" were chosen, not in the hope of extending the patent to cover the function of the film, but for the purpose of ready identification within the scientific field in which the investigations had been conducted.

The properties of animal glue discussed in the case of Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868, relied upon by the defendant, are thought to be easily distinguishable from a scientific appellation such as is here under examination.

It is not asserted in this patent that this film possesses all known properties of heat resistance. It is merely a characterization of one aspect of the film which also is stated to possess dielectric properties. The composition of the film is stated in terms of belief.

Again, it is said that the patent is void because the terms "high density," "highest specific resistance," "high dielectric strength" and "close adherence to the underlying metal," and "capability of resisting electrolytic attack at a high temperature" are indefinite.

It seems rather late in the day to rely upon such an argument.

The testimony is that the patent contains a sufficient disclosure of the method of film formation to enable a person possessing ordinary skill to form the film. The testimony further is that the defendant formed such a film, although at a point or two below boiling temperature.

Further it clearly appears in the record that both the devices in question have met the requirements of radio manufacturers over a period of years, which would seem to indicate that the teachings of the patent have been adequate in a practical sense.

Much argument is directed against the amendments made in the application for the second patent, and attention is constantly called to the fact that, at the time of the filing of the application and for many years thereafter, the adaptation of the disclosure to a filter circuit in a radio receiving set was not contemplated, and the suggestion is that, because such became desirable in about 1927 –28, the plaintiff was able to perpetrate a series of incantations upon the Patent Office, which resulted in the final issuance of the letters. Recourse is had to the argument that, because the drawing of the patent discloses a structure containing two anodes which would be required for use in connection with an alternating current, the substitution in certain of the claims of a one anode structure was such an expansion of the patent and such a change in the invention as first presented, that the original teachings were departed from, and consequently the patent was illegally issued.

The defendant is rather driven to this position, because its device is described in the terms of claims 10 and 12 of the second patent; therefore, in order to demonstrate that neither device now under examination is an embodiment of the patents in suit, it is necessary to escape the terms of the second, by asserting that it was improvidently granted.

This argument largely depends upon the matters heretofore considered, and involves the difference between a rectifier and a condenser. No one disputes, and least of all the plaintiffs, that both Pollak and Bottome disclosed a single anode structure, but they are both rectifiers, and the defendant does not undertake to demonstrate how such a rectifier can function, dealing as it does with alternating current only; that is to say, a current in which the polarity reverses in every cycle, having in mind the unidirectional characteristics of the single anode film.

In this connection, it is urged that there is only D. C. current entering the plaintiffs' copper can, i. e., the cathode, and that this proves illegal expansion of the patent.

It is necessary to recall that the condenser consists of armatures, namely, the aluminum armature (called the "anode" for convenience) and the electrolyte armature, the two being separated by the dielectric, which is the film. The function of the condenser is performed by these elements, the aluminum armature being positive to the electrolyte. The current which emerges from the latter is unidirectional and is accepted by the copper "cathode" and passed.

Therefore the contention that there is no alternating current, if by that is meant a current of reversed polarities, delivered to and passing through the copper, is merely another way of saying that the condenser performs its functions.

The argument therefore, if understood, seems to lead to no valuable conclusion.

The repeated allusions to unilateral and bilateral condensers, while not founded in technical authority, probably serve a useful purpose, in bringing to light the difference between a condenser designed to accept alternating current per se, and one designed to accept only unidirectional current of alternating derivation. Plaintiffs' Exhibit 29 is an example of the former, and plaintiffs' Exhibit 12 is an example of the latter. Exhibit 29, according to the testimony, will function in a radio filter circuit, but, in theory at least, one-half of its capacity is unemployed.

The defendant's expert, Mr. Graner, says that the copper cans of both present devices have no operative function so far as the condenser goes, and a glass container could be substituted without disturbing the success of the device. If this be true, the question is presented as to why the defendant uses the copper container at all. As a matter of testimony, it appears that each copper container completes the circuit of the condenser.

Another argument directed against the first patent is that the disclaimer is void and ineffective to exclude organic acids from the scope of the claims and the pertinent prior art.

It will be recalled that claim 5 is as follows: "An electrolytic condenser comprising

a containing vessel; aluminum electrodes therein, coated with heat-resistant electrolytic films; and an original electrolyte in the vessel, containing borax and a free acid."

The disclaimer covers "any acidulated electrolyte which is not acidulated with an inorganic acid such as boric or phosphoric acid." Therefore any acidulated electrolyte not acidulated with an inorganic acid is a limitation upon the electrolyte as described in the patent. The pertinent specification is: "The nature and amount of the acid or acids used to acidulate the new or fresh electrolyte may vary widely. In general, the acid should be one a salt of which can be used as a film-producing agent, as for example boric or phosphoric acid. Thus boric acid may be used in a phosphate electrolyte, and phosphoric acid in a borax electrolyte. The quantity of the free acid used may be large or small, but in my extended tests and practical experiments I have secured the best results (that is, the best results obtainable with a fresh electrolyte) with an electrolyte of the following proportions: distilled water, one gallon; boric acid, one and a half pounds; borax, one quarter pound." The acid above referred to is restricted by the disclaimer to an inorganic acid such as boric or phosphoric acid.

The case of Grasselli Chemical Co. v. National Aniline & Chemical Co., Inc. (C. C. A.) 26 F.(2d) 305, cited by the defendant, seems to be as much in favor of the disclaimer as it is against it.

The case of Fruehauf Trailer Co. v. Highway Trailer Co. (D. C.) 54 F.(2d) 691, seems to involve facts quite remote from those here under examination.

So far from expanding the claim of the patent, it is thought that the disclaimer here involved very obviously limits something which was specifically claimed, i. e., a free acid, to "an inorganic acid such as, etc."

There remains to consider the question of jurisdiction based upon the sale made by the defendant O'Neill to the plaintiff within this district. It is urged that this transaction is colorable and that O'Neill became the agent of the plaintiff rather than of the defendant; but the testimony does not so establish. A person acting for the plaintiff called O'Neill on the telephone, and asked for the devices of the defendant's manufacture such as Exhibits 6, 7, 8, and 9. O'Neill agreed to furnish them at the regular prices, and did so, paying less for the articles than he sold them for to the plaintiff. What other element is necessary to constitute a sale in the regular course of business has not been disclosed. Certainly there was no element of collusion, and the transaction seems to be covered by the decision of Bassick Mfg. Co. v. Ready Auto Supply Co., Inc. (D. C.) 22 F.(2d) 331, at page 339.

As heretofore stated, the question of infringement presents no difficulties.

The defendant's device closely duplicates that of the plaintiffs, and its manufacture has been carried on under the direct supervision of the witness Robinson, who quite frankly but perhaps inadvertently characterized defendant's product as "a Chinese copy" of the plaintiffs'.

The forming of the film in the defendant's factory is at two or three degrees below boiling point, and, to this extent, the method taught by Mershon has been departed from, but the heat-resistant film so produced is not to be distinguished from that which characterizes plaintiffs' product made in accordance with the teachings of the first patent in suit.

The appearance of the aluminum anode, of course, is different, as has been heretofore stated, but in both the plaintiffs' and the defendant's anode, the same effort has been made; that is, to produce an aluminum member of extensive area in a small compass, and the mere fact that the defendant's is arranged in a series of coils and the plaintiffs' is in the form of a strip closely rolled about an aluminum post does not differentiate the two devices for present purposes; nor is it so urged on the part of the defendant.

In both structures, the electrolyte is acidulated, i. e., it manifests acid reaction.

It results from the foregoing that, as both the devices embody the teachings of the two patents in suit, infringement is shown on the part of the defendant. The plaintiffs' patents are held to be valid, and to have been infringed by the defendant, the direct infringement as to the second patent being as to claims 10 and 12.

If the foregoing betrays an approach to an understanding of the issues involved, that result is to be attributed to the carefully prepared briefs of both counsel, and to their patient and painstaking methods in the presentation of the cause at the trial, and in their oral and written arguments.

If findings are desired, they should be settled on notice, and should contain appropriate recitals as to incorporation, ownership of the patents and licenses, etc.

Settle decree in the usual form, on ten days' notice.

## Supplemental Opinion.

In connection with the settlement of findings and a decree in this case, and the consequent re-examination of the opinion dated July 22, 1932, it becomes apparent that there are inadvertent errors appearing in the latter, which should be corrected.

In the preoccupation attending an examination of a long record, many lengthy exhibits, and four briefs, sight was lost of the distinction between the defendant in this case and the Sprague Specialties Company, of North Adams, Mass., a Massachusetts corporation, and the manufacturer of the infringing device purchased by the plaintiff from the defendant.

The defendant's cause was presented by solicitors retained and compensated by the Sprague Company, and the entire trial assumed the aspect of a contest between the plaintiff and the Sprague Company. For this reason, the Sprague Company came to be regarded as the defendant, and was so treated in the trial and on the argument, and the Court fell into the manifest error of so referring to it frequently in the opinion.

The many references to the defendant corporation, its hiring of individuals formerly in the employ of the plaintiff, and its factory practice in the matter of forming the heat-resistant film, are unfortunate, and are regretted; these references were intended to apply to the Sprague Specialties Company, and not to the defendant, John Frederick O'Neill.

In the early part of the opinion, reference is made to a Mr. Appleton, who is said to have entered the employ of the defendant. That statement was based upon conflicting evidence, and is now withdrawn, in light of a further consideration of the record, which indicates that Mr. Appleton never actually entered the employ of the Sprague Company.

In discussing the prior art and in reference to the Pollak Patent No. 672,913, a typographical error occurs, in that the word "electrolyte" was used before the word "transforming." This was intended to be "electrolytic."

In connection with the same patent, there is a discussion of its bearing upon the second patent in suit, and communications from the Patent Office are quoted. In the third paragraph following the second quotation, reference is made to the distinction between a rectifier and a condenser. Near the end of that paragraph the phrase occurs:

"was intended to be used as a rectifier." The correct rendition of this phrase is "was attempted to be used as a rectifier."