# LAKESHIRE CHEESE CO. v. SHEFFORD CHEESE CO. *

## No. 5055.

Circuit Court of Appeals, Seventh Circuit.
July 24, 1934.

Rehearing Denied Oct. 1, 1934.

Charles Neave and Maxwell Barus, both of New York City, and L. C. Wheeler and S. L. Wheeler, both of Milwaukee, Wis., for appellant.

Louis Quarles, of Milwaukee, Wis., and Arthur M. Hood, of Indianapolis, Ind., for appellee.

Before SPARKS and FITZHENRY, Circuit Judges, and LINDLEY, District Judge.

FITZHENRY, Circuit Judge.

This is an appeal in a suit in equity to restrain alleged infringement of Wheeler and Scott United States patents, 1,639,828, for process for treating cheese, and 1,523,678, for cheese treating apparatus. The lower court held each of the patents invalid as to the claims in suit and not infringed. Appellant,

*Writ of certiorari denied 55 S. Ct. 149, 79 L. Ed. —.

plaintiff in the court below, appealed from that part of the decree relating to the process patent, No. 1,639,828, covering a method of making "process cheese."

The practice of processing cheese began some time prior to the issuance of the patents in suit. The object was to improve the texture of the cheese previously manufactured, partially sterilize it so as to improve its keeping properties, and turn out a uniform product in molds convenient for marketing and use.

Wheeler and Scott, patentees of the patents in suit, in the specifications of their process patent described its objects as follows:

"The objects of this invention are to provide means whereby cheese derived from differing sources or manufactured under differing conditions may be improved in quality, modified in characteristic flavor, and rendered homogeneous and sufficiently sterile to enable it to be packaged and kept without material deterioration through considerable periods of time.

"A further object of this invention is to provide an improved method of heat treating cheese whereby the process may be continuously and expeditiously carried on under conditions of perfect sanitation, and whereby the results mentioned in the preceding paragraph may be more perfectly attained at less expense than by the heat treating processes heretofore followed."

Claims 4, 5, 7, 8, and 9 are involved in this litigation. Claim 8 is typical of the others: "8. The process of treating cheese, which consists in passing a stream of cheese through steam having a temperature adequate to reduce particles of cheese substantially to a liquid upon momentary exposure thereto, and exposing substantially all particles of said cheese momentarily to such steam and then immediately moving them out of contact therewith."

By reading these claims, in the light of the specifications, it is apparent that the process involved consists of: (a) The passing of a stream of cheese continuously through steam; or sending it through a cylindrical tube by means of a screw conveyor where it is kneaded and exposed momentarily to jets of steam, (b) having a temperature sufficient to reduce particles of cheese substantially to a liquid upon momentary exposure thereto, (c) exposing substantially all particles of said cheese momentarily to such steam, and, (d) then immediately removing them out of contact therewith.

Wheeler and Scott suggest three methods by which their process may be used: (1) Ground or comminuted cheese is delivered through a hopper into a tube through which it is propelled horizontally by a rotating conveyor and carried rapidly past jets of live steam. The melted cheese, thus produced, is carried to the other end of the conveyor, where it is treated by jets releasing carbon-dioxide and then delivered by the screw propeller to the end of the tube into a mixing or package device. (2) The ground cheese is preheated, compacted, and then forced downwardly through a small opening, giving it the shape of a belt or ribbon as it enters a small steam chamber on a perpendicular plane. Immediately it drops to the bottom of the chamber, after the contact, to a tube which carries it to a conveyor, having been exposed to the steam but a moment. The second method outstandingly illustrates the conception of the invention as it involves a stream of heated cheese, in the form of a belt or ribbon, and sends it directly through the steam chamber, where the cheese remains but long enough for the steam to act upon the particles of cheese of the ribbon or belt and then immediately the melted cheese is withdrawn therefrom. (3) The third method suggested for using the process approaches the prior art much more nearly than either of the others. It involves the use of a kettle. Ground cheese is continuously fed into the top of the kettle, jets of steam are directed into the lower part of the cheese mass, while the cheese is being agitated by a propeller so as to bring fresh surfaces of the cheese momentarily and continuously in contact with the steam jets. The melted cheese is continuously and promptly removed from contact with the steam by sinking to, and passing out of, the bottom of the kettle. The practice of this process, by use of the kettle, involves the use of a continuously operating paddle with a tubular shaft supporting and operating the blades. The shaft is rotatively connected with a steam main to receive steam therefrom while the shaft is being operated. The steam is delivered through the rotatable shaft into direct contact with the cheese mass. The treated cheese, which is also given a treatment of carbon dioxide, then passes out of the bottom of the kettle through the large tube for further agitation or packaging.

It is the first method suggested that appellee is charged with infringing. The apparatus used by appellee operates from right to left, whereas, the method as illustrated in the patent in suit, operates from left to right. The right half of the machine used by ap-

pellee in the operation of its process is a hot water heater in which the water is kept at a high temperature, from 180° to 190° Fahrenheit. The heat is delivered to the cheese which is being fed at the right into a cylindrical casing, in the center of which a screw conveyor is used which carries the cheese, as heated and kneaded, to the end of the heater where it overlaps the steam element and drops from the end of the heating element into the steam element and is conveyed through the steam chamber, which is another cylindrical tube, and which carries the cheese past several steam jets, where the mass is exposed to steam momentarily and then immediately removed to the end of the chamber, where it is delivered by the conveyor. The cheese thus treated then drops from the end of the steam chamber under the impelling force of the screw conveyor and passes through a pipe into a mechanical mixer. Appellee contends that by its process the operation is not completed when the cheese leaves the steam chamber, but must proceed and receive the treatment of the mechanical mixer, claiming that its cheese is only partially processed at that point. Without now discussing the intimate relations between the process of the patent in suit and the accused method of appellee, it may be appropriate to observe that, if the patent in suit is valid, appellee in its process has added the use of a preheating unit to feed the steam chamber and the use of a mechanical mixer following the processing of the cheese in the steam chamber.

It is shown by the Wheeler patent that in order to use steam effectively small particles of cheese must be brought successively into momentary contact with steam and then promptly removed from the heating zone, the operation being continuous. Prior to the teaching of Wheeler and Scott, the patent in suit, cheese had been uniformly processed by what is known as the batch or kettle system, with one exception, that of Parsons, which will be discussed later.

▮ Whether a patent involves invention is to be determined in the light of historical facts rather than what might appear to be simple in the light of hindsight.

▮ "A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result." Cochrane v. Deener, 94 U. S. 780, 788, 24 L. Ed. 139.

▮ In tracing the development of this art by an examination of the various patents which have been granted, we find that the art progressed from the ordinary, open kettle, operated by hand with a paddle with which to stir the cheese mass while being treated, to a power-driven paddle and, with the aid of power, the larger kettle and the variations in methods of applying heat to the kettle. This was followed by the development of the kettle within a steam jacket and, more recently, the direct application of steam to the cheese mass in the kettle and the accompanying use of a vacuum tank to remove the steam from the kettle prior to condensation, in order to avoid an excessive amount of water in the cheese mass. This later development was the invention of Schaefer, in patent No. 1,522,794. The Schaefer patent involves a continuation of the use of the kettle, "batch" system, but it does include the direct application of steam to the mass. The kettle is filled and covered with a steam connection, and also a connection with a vacuum tank in the cover. Schaefer's conception is well illustrated by his claim 9, which is as follows: "A process of remaking cheese characterized by comminuting cheese, introducing dry or substantially dry steam into the cheese mass to heat the same, drawing the steam from the container by vacuum means, preventing water of condensation in the removed steam from returning into the container, and stirring the cheese mass while the steam is passing therethrough."

The Schaefer process was used by the Velveeta Cheese Company, of which Schaefer, the patentee, was general manager. First, the Schaefer process was followed by the use of a small kettle, later, a large kettle which had a double jacket and a capacity of 75 pounds of cheese which it required practically fifteen minutes to cook properly. In the small kettles only about five minutes were required. In the large kettles the space between the kettle and the jacket was filled with hot steam to assist in heating the mass within the kettle. When the kettle was loaded it stood below the cover and was raised to the cover and there held by the vacuum. The inlet of the steam and the connection with the vacuum tank were both in the cover. Nothing extended below the cover except the steel rod which operated the mixing paddle. It was shown on the hearing that Schaefer's process

was slow, requiring a loading of the kettle, the fifteen minutes operation to cook the cheese, the heating of the bottom of the kettle by the steam, then the discontinuation and separation of the kettle from the cover and the unloading of the contents. The use of the steam in this connection and under these circumstances, it is claimed by appellant, and not without reason, causes the greatest value of the steam to be lost as the vacuum operated to prevent the steam from condensing upon the various particles of cheese and communicating thereto the latent heat units of the steam.

The record shows that with the exception of the patent in suit, the Schaefer process was the only one suggested that involved in any way the direct application of steam to cheese particles in the manufacture of processed cheese. The patent in suit, as disclosed by Wheeler and Scott, teaches a continuous process of cooking cheese, exposing the various particles of cheese to the live steam momentarily and then removing the melted cheese. The kettle, batch system, with its incidental slowness and delays in operation, is entirely eliminated, if desired. In addition to the Wheeler and Scott and Schaefer processes, it was shown that the Phœnix Cheese Company of Sidney, N. Y., manufactured processed cheese for the United States Navy. It used a jacketed copper mixing kettle of 400 pounds capacity. The cheese was ground cold and put in the kettle and heated indirectly by the steam jacket. There was a double-action mixer with scrapers on the inside and contacted with the wall of the kettle. The kettle lasted a long time, but the scrapers broke off on the side of the mixer and pushed a hole into the wall of the kettle occasionally; the hole opening from the steam jacket into the kettle allowed steam to pass directly into the cheese. The Phœnix Company used the kettle for some time, but plugged up the perforation because it found it caused too much moisture in the cheese. Some of it was rejected by the United States Navy and had to be worked over again with another grade of cheese.

However, from the accidental perforation of the kettle, no new process was devised, but the lesson which the accident taught was disregarded and is now a bit of history related by a witness.

It was shown that by the manufacture of processed cheese by the Wheeler and Scott process as high as 6,000 pounds per hour might be produced, 60,000 pounds in a 10-hour day, while appellee's alleged infringing process will produce 4,000 pounds per hour. Appellant contends this is due to the defective application of its patented process by appellee. In volume of production, there is no comparison between the amounts of processed cheese that may be produced by the application of appellant's system and that of the older systems of the prior art involving the kettle, batch method. In addition, Wheeler and Scott's system of processing cheese by passing a film of cheese through steam, receiving the benefit of its latent heat, cooking and immediately removing it from the steam, results in a product of greater market value, well within the lawful water content requirements, uniform and homogeneous in texture, and keeping well. It is produced under perfect sanitary conditions, in prolific quantities, and at a minimum of cost. To suggest such a method is certainly invention.

Relative to the Parsons patent, heretofore referred to, Parsons had two patents, one for the emulsification and pasteurization of cheese, No. 1,522,384, and No. 1,522,385, for the process of making a pasteurized loaf cheese, both patented on January 6, 1925. The process disclosed by the two patents involves the loading of the hopper of a machine with ground or comminuted cheese, where it is received in a horizontal chamber in which a screw conveyor mixes and conveys the mass through a chamber filled with vertical tubes which contain hot water or any other heating element, the pressure of the screw conveyor forcing the mass through the tube chamber where it is received in a sort of spout and discharged. It is a continuous operation.

This method might have many virtues, but it does not involve the application of steam directly to the particles of cheese, even though it may distribute the B. T. U.'s more uniformly than would be attainable by cooking a mass of cheese in a large kettle. Beyond the fact that it presumes to teach the art the desirability of continuity of operation, it involves none of the other substantial elements involved in the patent in suit.

In the history of the prior art of manufacturing processed cheese, there is nothing that teaches the use of a direct application of steam to particles of cheese for a few seconds and then immediately removing the cheese from the exposure and this, in continuity of operation. It may be that most, if not all, of the elements involved in Wheeler and Scott's process for treating cheese are old, but they were the first to so put them together as to produce the method which possesses both novelty and utility.

We have examined all of the patents upon which the District Court passed in making its finding of anticipation, that is, Merrill reissue No. 5,797, Nagel No. 393,023, Brussels No. 604,348, Baxter No. 959,448, Roberts No. 1,247,153, and Smith No. 1,556,365, in addition to Schaefer.

Merrill's reissue patent described an apparatus for cooking green corn by steam in an inclosed chamber providing automatic means for feeding and discharging the corn continuously.

Nagel described an apparatus for cooking grain in which the grain is continuously fed into a steam jacketed vertical cylinder; the cylinder containing various baffling devices to retard the passage of the grain while permitting the steam to escape.

Brussels described an apparatus for cooking and pressing fish which comprises a closed cylinder in which steam is maintained under pressure with automatic means for feeding a continuous supply of fish into and through the cylinder.

Baxter describes an apparatus for cooking corn or other food products. By this apparatus steam is directly injected into the comminuted material.

Roberts describes a process for cooking "a mealed forage." The material enters a hopper, passes down into a tube through which it is forwarded while being stirred and steam is injected directly into the material.

Smith describes an apparatus for cooking foods, such as apple sauce, in which apples were continuously cooked by steam by conveying them slowly over steam jets and then sent to a beater which converted the product into apple sauce.

These various patents involve apparatus and not processes, and none of them suggest any method of manufacturing processed cheese, notwithstanding the conclusion of one witness that ground cheese could be fed into most any one of these apparatus and taken out processed cheese. In practically every case the result would be either ruination or destruction of the product.

Counsel in their briefs cite eight additional food steaming patents from the prior art, as follows: Beach, No. 126,511, for curing corn and destroying the germ; Oatman, No. 346,062, which involves a process for making cheese from milk artificially enriched with oils; Merrill, No. 391,907, which is another corn cooking process; Frederiksen, No. 482,897, a process which involves injecting high pressure steam into a tankful of milk in order to heat it up to 190° to 200° Fahrenheit to coagulate the albumen in the milk; Dunham, No. 723,254, which describes a process of producing milk powder, involving a treatment for twenty minutes; Herendeen, No. 1,073,986, describing an apparatus for treating flour in which the flour is suspended in an atmosphere of steam to absorb moisture and then dropped and passed between hot rolls which cause the starch cells in the flour to explode; Gere, No. 1,188,755, which involves a process of making powdered milk; Vaudreuil, No. 1,374,341, involving an apparatus for cooking vegetables by immersion in a shallow body of boiling water with steam under pressure in which, it is claimed, the combination of steam and water at the boiling point cooks more rapidly than boiling water alone.

Certainly none of these additional patents are even suggestive of the momentary exposure of cheese particles to live steam and their immediate removal, in a continuing operation, such as is taught by the Wheeler and Scott patent in suit.

On the question of infringement, a mere comparison of the description of the first method suggested by Wheeler and Scott, above outlined, with that of the accused method, is all that is necessary to establish infringement. With appellee's preheater and alleged mechanical mixer removed, what is left is almost a "Chinese" copy of the method of the patent in suit. The difference contended for by appellee is that the cheese fed into the steam chamber in its process is not in particles as described in the patent in suit, but rather is a stringy, ropy, mass. This contention is, in a measure, an admission by appellee that in the operation of its process, it is making use of appellant's process, but slightly changing the character of the material used. In other words, it admits a partial infringement, and this may account for the necessity of requiring the aid of a mechanical mixer in appellee's process as the effluent leaves the steam chamber.

The decree of the District Court is reversed, and the cause remanded for further proceedings in harmony with the views here expressed.