## PENNSYLVANIA RESEARCH CORPORATION v. LESCARBOURA SPAWN CO.
### No. 9909.

District Court, E. D. Pennsylvania.
July 6, 1939.

Paul N. Critchlow (of Brown, Critchlow & Flick), of Pittsburgh, Pa., for plaintiff.

Busser & Harding, of Philadelphia, Pa. (George A. Smith, of Philadelphia, Pa., of counsel), for defendant.

KALODNER, District Judge.

This is a patent infringement suit in equity. Both parties, after trial on the merits, have filed requests for findings of fact and conclusions of law.

Defendant, at the outset of the trial, moved to dismiss. Counsel for both sides agreed, however, that the motion might be affected by testimony to be adduced during the trial. Decision on the motion was reserved, but it will not be necessary to dispose of the motion separately. The decision on the merits will include the decision on the motion.

Suit was instituted by the filing of a bill of complaint. Defendant filed a responsive answer and, through the medium of a counter-claim, asked for a declaratory judgment declaring the patent involved in the suit invalid. The purpose of the counter-claim was to assure an adjudication of the rights in controversy in the event plaintiff attempted to withdraw the action. This procedure is proper and has been approved. Meinecke v. Eagle Druggists Supply Co., Inc., D.C., 19 F. Supp. 523.

Several days before trial plaintiff entered a disclaimer, duly recorded in the Patent Office, restricting one or more of the claims of the patent. Defendant thereupon moved to amend his answer and counter-claim so as to embrace matters allegedly arising because of the filing of the disclaimer: and also made the above-mentioned motion to dismiss, because of the disclaimer. There was no objection to the motion to amend, but the motion to dismiss is, of course, opposed.

Plaintiff, a non-profit scientific research corporation, organized and controlled by Pennsylvania State College, is the owner by assignment of Patent Number 1,869,517, involved in the suit. As originally granted, the claims of the patent were directed towards a mushroom spawn, and a method of making it in which cereals, such as rye, whole grain wheat, barley, oats and seed were included as a substrate. The disclaimer limited the substrate to a member of the group of cereals and cereal products consisting of hominy, cracked wheat, whole grain wheat, barley and rye.

A description of the patent is necessary.

Prior to the granting of the patent (August 2, 1932) mushrooms were, to all practical purposes, grown universally in one way. Mushroom spores—unicellular organisms developed in the adult mushroom—are sown on a convenient sterile nutritious medium and there allowed to germinate. The medium may be sterile washed manure: or, better, a solution of agar in water containing various nutrients. Here the spores, maintained under properly conducive temperatures, germinate and throw out white root-like growths called mycelium.

What has been described above is called making a culture.

After a few days of reproduction, evidenced by mycelium growth, the culture is transferred to a quart-size bottle. The bottle is packed with composted manure. Composting manure is treating it for a period of some weeks, so that it becomes decomposed and loses some of its food value—food for micro-organisms, that is. It is also washed to remove its brown coloring matter and offensive odor, and then dried to remove excess moisture. After the long straw has been removed, the manure thus prepared is packed closely in the bottles and a hole bored in the center to permit the introduction of the culture.

The bottles are then stoppered with cotton plugs to prevent the entry of undesirable micro-organisms and are sterilized under steam pressure. They are then ready for inoculation, which is accomplished by transferring a small portion of the pure culture to the center of the bottle under sterile conditions. Following inoculation, the bottles are allowed to incubate for a month or six weeks under constant fixed conditions of temperature and humidity. During this period, the mycelium spreads out through and penetrates the manure in the bottle until the contents of the bottle become a mat or

cake rendered compact by the growth of thread-like mycelium throughout. The contents of the bottle at the end of the period are known as mushroom spawn and are thereafter maintained at low temperatures until sold or used for planting in order to grow mushrooms.

This completes the second stage—making of mushroom spawn.

The third stage is the planting. The bottles are broken, the contents broken up into about forty pieces approximately the size of walnuts, and planted in beds which also consist of composted manure—the beds being in houses. Stated temperatures are maintained in the houses: several weeks after planting, a layer of soil is placed above the manure: the mushrooms (the fruit of the plant) appear, and after several months it is necessary to renew the nutrient material of which the beds are composed.

This completes the third stage—mushroom growing.

The method involved in the patent is different.

Certain cereals or cereal products form the basis of the method. A grain, such as wheat for example, is cooked in water, then sterilized in cotton stoppered vessels under steam pressure. The vessels are then inoculated with a culture of pure mycelium, such as previously described, and incubated at fixed temperatures until the substrate (under the patent, the grain, and under the old method, the manure) is thoroughly overgrown with mycelium. Even distribution of the latter is furthered and its growth hastened by shaking the vessels at intervals. Shaking also keeps the grain units separate.

After a suitable interval, each grain or unit in the vessels becomes overgrown with mycelium, so that each grain or unit forms a mat. The process of spawn making is now completed. The spawn is shaken out of the vessels, the lumps are broken up and are ready for planting. Planting is done in the same medium and in the same way as under the prior method.

As appears in the original patent and in the testimony, the composted manure substrate used under the old method and the grain substrate described in the patent are different in chemical composition. While both contain some common constituents, each contains constituents not contained in the other: and the percentage of the common constituents is different in each case.

The patent lists differences between the old and new methods as follows:

The composition of the substrate or culture medium is different in each case.

The manure used in the old method loses nitrogen: no food material is lost from the substrate in the new method.

The substrate in the new method is more easily and conveniently divisible.

The manure used in the old method requires elaborate treatment: none is necessary with the substrate material used in the new method, except for the addition of water.

Inoculation is more readily affected in the old method than in the new.

The new method boasts greater ease in distribution of the spawn upon sale.

The physical condition of the new spawn is such as to facilitate sowing in the beds with less labor than under the old method.

The above differences as described in the patent purport, of course, to express advantages in the new method as well as differences. The patent summarizes the advantages separately, however, and adds some to those already described. Among them are:

(1) In the new method the mycelium can still draw upon the substrate for further food after it has been placed in the beds—making for faster growth and possibly the production of larger mushrooms.

(2) Preparation of manure substrate under the old method was much more expensive and laborious than under the new. In addition, the new method permits mushroom growers to make their own spawn to a degree not possible under the old method.

(3) Sterilization is made easier under the new method.

(4) The old method involved breaking the bottle containing the manure spawn before use—an expense practically eliminated in the new method.

(5) The new method permits more even distribution of the spawn in planting: the mycelium grows from more foci resulting in an earlier production of crops.

(6) A quart of the spawn made by the new method will sow three times as much bed as that made by the old method.

The claims of the original patent were as follows:

(1) Mushroom spawn comprising a cereal substrate inoculated with mycelium.

(2) Mushroom spawn comprising a cereal substrate overgrown with mycelium.

(3) Mushroom spawn of granular form comprising a cereal substrate overgrown with mycelium.

(4) The method of making mushroom spawn including sterilizing a cereal substrate, inoculating the substrate by ·introduction of a culture, and incubating until the substrate is overgrown with mycelium.

(5) The method of making mushroom spawn including preparing a substrate by treating cereal material with water and sterilization, inoculating the substrate by introduction of a culture, and incubating until the substrate is overgrown with mycelium.

The relevant portion of the disclaimer restricting the claims reads thus:

"Therefore, your Petitioner hereby enters this disclaimer to those parts of the specification of said patent which are in the following words, to wit:

" 'oats, rice, etc. (also other seeds as clover, bean, pea, etc., or ground-up corn cob)' (Page 2, lines 18 and 19).

" 'or seeds similar in nature' (Page 2, line 81).

" 'Where in the following claims the term "cereal" is used it will be understood that it refers not only to the substances which are the equivalents of grains in the above process, such as seeds, ground-up corn cob, or the like.' (Page 3, lines 81 to 86, inclusive).

"And your Petitioner hereby disclaims from the scope of claims 1, 2 and 3 any cereal substrate which does not include a member of the group of cereals and cereal products consisting of hominy, cracked wheat, whole grain wheat, barley and rye.

"And your Petitioner hereby disclaims from the scope of claims 4 and 5 any method of making mushroom spawn in which the cereal substrate does not include a member of the group of cereals and cereal products consisting of hominy, cracked wheat, whole grain wheat, barley and rye."

In general, it may be said that the plaintiff adduced testimony supporting the differences and advantages above described.

The charge of infringement is based upon the defendant's admitted use of a mixture of grain and manure as a substrate for spawn-making, and the sale of the spawn thus made. The defendant still used quart-size bottles as containers for the spawn and substrate, but instead of using manure alone, mixed the manure with from one-quarter to one-half as much grain as the method described in the patent used for making a quart of spawn.

The defendant denies that the use of such mixture constitutes infringement: attacks the validity of the patent upon the grounds of lack of invention and anticipation: and further contends that the disclaimer, being improper, invalidates the patent.

■ It is clear that the new method exhibits invention. I am convinced by the testimony that the cereals or cereal products specified in the patent, as modified by the disclaimer, make a better substrate for mycelium growth in spawn-making than the composted manure used in the old method: and that the new method contains new and useful improvements over the old, generally in the respects outlined above. The testimony of Dr. Sinden and Mr. Wolcott establish that much, and the defendant does not seriously contest the advantages of the new method.

■ I am not impressed with the defendant's argument that the patent lacks invention because its results were or should have been expected by Dr. Sinden. The theory of unexpectedness as a sine qua non of invention cannot be extended too far. While some discoveries are stumbled upon by accident, most of them are made by persons seeking to attain the desired result. Since most inventors are optimistic, it might be said most inventions are expected. The theory, therefore, has its limits. The limits are naturally incapable of precise delineation: but certainly the mere circumstance that one experiments in the hope of attaining a desired result cannot of itself exclude the factor of invention once the result is obtained. In the instant case, use of manure as a substrate had long been a standard in mushroom spawn-making: investigators

344

experimenting with other materials had come to the conclusion that none was so effective. Considered from that viewpoint, a person skilled in the art—that mythical individual endowed with omniscience in the field covered by the invention—could not logically be supposed to have *expected* better results from cereals or cereal products, notwithstanding that he might have *hoped* for success in his experimentation with them, since experiment is rarely entered upon as a hopeless quest.

The idea that certain specified cereals would prove a better substrate for mycelium growth than the time-honored, if lowly, manure, does not impress me as one which would spring full-panoplied from the brow of any ordinary laboratory worker seeking to obtain a better substrate. On the contrary, I consider the idea to be one informed by the particular inspiration or scientific intuition which is at once the genesis and a characteristic factor of invention. There must be thousands of organic compounds containing chemical elements or combinations of matter, that might at first impression seem so constituted as to answer the purpose of an improvement upon manure: it can hardly be said, then, that the idea of selecting out of those thousands a cereal or cereal product for the purpose is one which would occur to any research worker equipped merely with ordinary laboratory technique.

■ Bulletin No. 85 of the United States Bureau of Plant Industry is relied on by defendant as constituting anticipation by prior publication, and it is necessary to consider the Bulletin, both to determine whether its contents do amount to anticipation, and to test invention in the patent in the light thereof, in view of the familiar rule that what is obvious to persons skilled in the art and acquainted with the common knowledge in that art, at the time of the alleged invention, is not invention. Alliance Securities Co. v. J. A. Mohr & Son, D.C., 14 F.2d 793.

Defendant points out references in the Bulletin to the growth of mushroom mycelium on cotton-seed motes, to the growth of fungous tissues on bean pods, and to the growth of mycelium on corn-meal, gluten meal, and so on. However, it is conceded by defendant that the Bulletin is directed, not to spawn-making (as is the patent), but to mushroom culture and planting—to the first and third stages of mushroom growing, but not to the second, the latter being the subject of the patent. Defendant's contention is that it does not require inventive skill to deduce that what is successful in growing culture will be equally successful in making spawn.

I cannot subscribe to that contention. Despite remarkable advances in chemical and botanical knowledge, the progress is more in the accumulation of data than in the understanding of ultimate causes, and in the ability to predict. General Elec. Co. v. Laco-Philips Co., 2 Cir., 233 F. 96. Therein those sciences differ from mechanics.

It has been observed that reasoning by analogy is very much more restricted in a complex field like chemistry than in mechanics. Naylor v. Alsop, 8 Cir., 168 F. 911, 919.

Moreover, examination of the Bulletin references relied upon by defendant lead to some interesting disclosures. The reference to cotton-seed motes was in a tabulation drawn up to show the efficiency of certain chemical salts on media—not the efficiency of the media in cultures. As to bean pods, they are neither cereals nor cereal products. As regards the reference to corn meal, page 28 of the Bulletin, aside from the fact that the discussion was anent cultures, it is of interest to note that on page 26 the Bulletin observes that "it has been difficult" to obtain a reliable solid substratum as a medium for the growth of Agaricus campestris (mushrooms) as a culture.

■ The fact that for years no advance was made in the art, despite many efforts, is persuasive on the side of invention. Anticipation must be tested by foresight, not hindsight; and the presence of invention should not be determined with senses informed by the inventor's disclosure. Lakeshire Cheese Co. v. Shefford, 7 Cir., 72 F.2d 497; Ideal Stopper Co. v. Crown Cork & Seal Co., 4 Cir., 131 F. 244; Johnson v. 42nd St. R. Co., C.C., 33 F. 499; Vortex Mfg. Co. v. Ply-Rite Contracting Co., D.C., 33 F.2d 302.

In Duplate Corp. v. Triplex Safety Glass Co., 3 Cir., 42 F.2d 739, it was held to be patentable to make safety glass by using *dehydrated* gelatin as an adhesive—although the prior art had used *wet* or *sticky* gelatin for that purpose.

Ex parte Bauer, 23 U.S.Pat.Q. 322, where Bauer was granted a patent, is closely analogous to the present case. The facts are these: Patent No. 1,835,-619 to Walsh et al. disclosed the use of vinyl acetate as an adhesive, and stated: "Any suitable vinyl compound, that is, a compound having the group $CH_2 = CH$ therein, may be used in our invention." Bauer in a later application claimed the use of a polymeric acrylic acid ester as an adhesive, and the examiner rejected the application on the ground that Walsh's patent indicated that all vinyl compounds were equivalents. The applicant contended that all vinyl compounds were not satisfactory adhesives when polymerized and that his compound was superior to that disclosed in the patent. In reversing the examiner, the Board of Appeals stated:

"If the quoted statement of the Walsh et al patent is merely prophetic, the patent is obviously of little value as a teaching of what may or may not be equivalents of the vinyl acetate to which the patent is primarily directed. If it is necessary to go through the long list of compounds containing the radical $CH_2 = CH$ to determine whether they are suitable, it seems to us that the patent has no anticipative value. In some cases, even though the prior art teach that the members of a class are equivalent to a member or members disclosed, if it develops through subsequent research that some one member or members of the class are highly superior to others and therefore not mere equivalents, a second patent may be granted."

The prior art was certainly closer in the cases mentioned than in the instant case.

■ So much for Bulletin 85. The witness Lambert's alleged prior use, relied upon as one of the defenses, is, even if established by the testimony, much in the nature of an abandoned experiment; but I cannot accept the testimony as establishing the defense. It is entirely oral; it relates to the years 1906 and 1919 (going back, therefore 19 and 32 years); it is entirely unsupported by patents and exhibits; it purports to be corroborated in one instance by a witness then 13, and in the other by a witness then 17, years old. The circumstance that by their nature the alleged exhibits, being perishable, could not so long endure, may be unfortunate, but does not help the defense. The corroborating evidence was weak. It is the universal rule, well established by the uniform current of authority, that proof of a prior use must be clear, satisfactory and beyond a reasonable doubt, and that oral testimony, unsupported by exhibits or records, is open to grave suspicion.

"Taking this evidence together, it falls far short of establishing an anticipation with that certainty which the law requires. As we have had occasion before to observe, oral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented, is, in the nature of the case, open to grave suspicion. The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 450 [36 L.Ed. 154] Granting the witnesses to be of the highest character, and never so conscientious in their desire to tell only the truth, the possibility of their being mistaken as to the exact device used, which, though bearing a general resemblance to the one patented, may differ from it in the very particular which makes it patentable, is such as to render oral testimony peculiarly untrustworthy; particularly so if the testimony be taken after the lapse of years from the time the alleged anticipating device was used. If there be added to this a personal bias, or an incentive to color the testimony in the interest of the party calling the witness, to say nothing of downright perjury, its value is, of course, still more seriously impaired. This case is an apt illustration of the wisdom of the rule requiring such anticipations to be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court that the transaction occurred substantially as stated." Deering v. Winona Harvester Co., 155 U.S. 286, 15 S.Ct. 118, 123, 39 L.Ed. 153.

To the same effect are Washburn & Moen Mfg. Co. v. Barb.-Wire Co., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; Searchlight Horn Co. v. Victor Talking Mach. Co., D.C., 261 F. 395; Yablick v. Protecto Safety Appliance Co., 3 Cir., 21 F.2d 885.

■ The probative value of Lambert's testimony is further affected by the unusual circumstance that it was he who first notified plaintiff that defendant was infringing the patent in mixing grain with manure

in spawn-making. I am fully aware that defendant engaged the witness to testify as an expert in ignorance of this fact, and in that sense no blame attaches to defendant because of Lambert's anomalous position; but defendant's innocence in that respect does not minimize the effect of the anomaly on the testimony.

Moreover, Lambert's status as licensee under the patent is inconsistent with his position as a witness testifying for the defendant in the attack on the validity of the patent.

For the reasons outlined in the above discussion, I find the patent valid from the standpoints of invention and anticipation. I now direct my attention to the disclaimer defenses.

I do not propose to run the gamut of the concededly shotgun barrage directed by the defendant against the disclaimer. The latter, restricting as it did the scope of the claims in the original patent, is within the purview of the disclaimer statutes (R.S. §§ 4917, 4922, 35 U.S.C. §§ 65, 71, 35 U.S.C.A. §§ 65, 71). See Altoona Publix Theatres v. Tri-Ergon Corp., 294 U.S. 477, page 490, 55 S.Ct. 455, at page 460, 79 L.Ed. 1005, where it was said: "The use of the disclaimer has been upheld where the elimination from the patent of the matter not relied upon did not operate to enlarge the monopoly of the patent, but narrowed it, * * * by limiting the claim to a specific type of the general class to which it was applied, Minerals Separation, Ltd. v. Butte & Superior Mining Co., 250 U.S. 336, 354, 39 S.Ct. 496, 63 L.Ed. 1019; United Chromium, Inc. v. International Silver Co., 60 F.2d 913, 914 (C.C.A.2d); Seiberling v. John E. Thropp's Sons Co., 284 F. 746, 756, 757 (C.C.A.3d)." See, also, Mershon v. O'Neill, D.C., 3 F.Supp. 26, later reversed on other grounds, 2 Cir., 73 F.2d 68.

I cannot adopt defendant's contention that there was a deceptive intention on the part of Dr. Sinden, the inventor, in claiming as broadly as he did in the original patent. His reputation, his standing, his qualifications, his appearance and demeanor before me, no less than the testimony, refute the contention. He was, of course, as all laymen are, guided by his counsel in applying for the patent; he testified, without contradiction, that his then counsel advised broadening the scope of the

protection as far as possible; and stated that in sending counsel a description of the invention he advised that certain materials therein included were then being tested. Dr. Sinden's then counsel is counsel for defendant in this litigation; in charging Dr. Sinden, in defendant's brief, with deceptive intention, I cannot help but feel that his "J'accuse" becomes automatically "Je M'accuse."

There was no such unreasonable delay in filing the disclaimer as to invalidate it. "The law is well settled that it is not necessary to file a disclaimer until there has been a judicial determination that the claim is invalid". Dykema v. Liggett Drug Co., D.C.1938, 19 F.Supp. 313, 320. See, also, Miller Co. v. Bright Light Reflector Co., Inc., 29 F.Supp. 334, 17 U.S.P.Q. 302, D.C.S.D.N.Y. Both cases cited are closely analogous, on the question of delay, to the instant case. Ensten v. Simon, Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453, relied on by defendant, is inapplicable. The patentee in that case failed to file a disclaimer for almost two years after certain claims of his patent had been adjudicated to be invalid, as shown by an earlier case involving the same patent. Ensten v. Rich-Sampliner Co., D.C., 13 F.2d 132.

Other contentions of the defendant with regards to the alleged invalidity of the disclaimer are without merit. The disclaimer is good and the patent valid.

As to infringement:

Defendant does not use a wholly grain substrate in spawn making. He mixes grain and manure: using from $\frac{1}{4}$ to $\frac{1}{2}$ as much grain for a given quantity of spawn as is used in the method described in the patent. Defendant contends that the use of a mixture such as this is not an infringement; especially since plaintiff admits that the accused spawn does not obtain all the advantages of the specified grain spawn disclosed in the patent.

The testimony, however, establishes infringement.

Dr. Sinden testified without contradiction:

"Q. From your examination of defendant's mushroom spawn would you say that it included 'a rye substrate inoculated and overgrown with mycelium'? A. Yes."

Claim 2 of the patent reads directly upon this: "2. Mushroom spawn compris-

ing a cereal substrate overgrown with mycelium."

The word in claim 2 is "comprising." Unlike "consisting of," the word is not exclusive, and covers cases where other materials may be included. Rye is one of the grains still specified in the patent after the filing of the disclaimer.

There is further testimony, either admitted or uncontradicted, and not necessary to specify here, that defendant made the accused spawn according to the methods defined in claims 4 and 5 of the patent, heretofore quoted—the method including sterilization of the substrate prior to inoculation with the culture, and treatment with water.

The accused spawn of course possessed some advantages of the patented method, else the defendant would not have used grain. Defendant, conceding arguendo that the accused spawn obtains advantages one and six listed in the patent, contends that one is old (Bulletin 85), and six is fictitious because defendant does not avail itself of the advantage that the plaintiff's spawn inoculates more bed per unit spawn than the old spawn.

The contention that one is old is based upon the assumption that it relates solely to the availability of more nutrient (in the spawn) in the beds where the mushrooms are grown, and that Bulletin 85 shows that this can be effected by the addition of grain nutrients in the beds separately. But the text of advantages one includes the statement that: "The substrate of the previous method after undergoing the process of washing and drying is depleted in essential food elements especially nitrogen and rather dry in texture so that after the mycelium has grown upon it for a month it has nearly exhausted the food in the medium *and is in a comparatively dry state so that it has lost a large part of its vigor and vitality.*" (Italics supplied).

The italicized portion of the text has nothing to do with available nutrient in the beds.

As to defendant's argument anent six, the fact that defendant does not utilize an advantage that exists, is not a convincing one. The advantage is there—in proportion to the amount of grain used—and could be utilized.

It is perfectly obvious that if the defendant used an all-rye substrate except for a minute amount of composted manure, that would be an infringement; and if he used an all-manure substrate except for a minute amount of rye, that would not be an infringement. Somewhere between the two, infringement begins: the point of beginning is where the amount of rye or other dominated cereal used is substantial: in this case the amount used is substantial.

The charge of infringement may not be avoided by adopting less than is patented, or adding something to what is patented, with the result of impairing or lessening the advantages or hindering the merits. The authorities are numerous.

"Infringement is not avoided either by impairment of function or by the addition of elements to the complete structure of the patent claims". Hartford-Empire v. Swindell Bros., 4 Cir., 96 F.2d 227, 231, citing Murray v. Detroit Wire Spring Co., 6 Cir., 206 F. 465. And in Telescope Cot Bed Co. v. Gold Metal Camp Furniture Co., 229 F. 1002, at page 1004, it was said: "Infringement may be found, although the infringing device does not obtain the advantages of an invention to the fullest extent." See, also, Sewall v. Jones, 91 U.S. 171, 183, 23 L.Ed. 275, 277; Nachman Spring-Filled Corp. v. Spring Products, 2 Cir., 68 F.2d 829. "Addition to a patented machine or manufacture," says Walker on Patents, Sixth Edition 1929, page 496, "does not enable him who makes, uses or sells the patented thing with the addition, to avoid a charge of infringement. This is true (among other things) * * * where the added part hinders the patented combination from having some of its minor merits."

For the reasons stated, I hold the patent valid, and claims 2, 4 and 5 infringed.